UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| MIDDLE EARTH HIGH STREET, LLC, | ) | |
| MIDDLE EARTH DEVELOPERS, INC., | ) | |
| TIMOTHY VOSS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | NO. 4:10-cv-00041-TWP-DML |
| | ) | |
| CITY OF LAWRENCEBURG, INDIANA, | ) | |
| REDEVELOPMENT COMMITTEE, | ) | |
| MARIO TODD, | ) | |
| THOMAS STEIDEL, | ) | |
| JOHN AND JANE DOE, | ) | |
| | ) | |
| Defendants. | ) | |

## **ENTRY ON JURISDICTION**

In 2008 and 2009, Plaintiffs and Defendants entered into two real estate construction projects, both of which went awry. The details of (and the fallout from) each project is discussed below. Pending in this matter is a Motion for Summary Judgment of Defendants; however, before the Court rules on the motion, it must determine jurisdiction.

**A. The Walnut Street Project**

In May 2008, Plaintiff Middle Earth Developers, Inc. ("MED") entered into a Real Estate Purchase and Development Agreement ("DA-1") with the Defendants City of Lawrenceburg ("City") and the Indiana Redevelopment Committee ("IRC"), involving the development of the city-owned "Walnut Street" property. Seemingly, the Walnut Street project presented a mutually beneficial opportunity: MED could buy the real estate and develop 13 residential town homes, while the City determined that "it is in [its] best interest to sell the

1

project to the developer while retaining certain rights to approve the design and final finish of the project."

Prior to entering into DA-1, MED furnished to the City itemized certified statements estimating the total development costs of the Walnut Street project at $2,350,736.00. To pay for the project, MED purchased the real estate from the City for $1, deposited $50,735.00 with a private lending institution, and obtained a $2,300,000.00 construction loan from that private institution. This loan was guaranteed by the City. Moreover, DA-1 required that "[a]ll construction work undertaken by [MED] . . . be performed in a good and workmanlike manner and in conformity with all applicable codes and regulations and the approved plans."

Moreover, DA-1 contained a provision – specifically 2.01(b), the so-called "buyout clause" – in which MED could request "that the [City] take the project back if sales of the originally planned project are not satisfactory to [MED] and if the City does not want to further subsidize the project." In turn, "[i]f [MED] makes such a request they shall relinquish all rights to the project and loan which shall be assumed by the City." For its part, the City was required to "cooperate with and assist the Developer in obtaining all government approvals" necessary to complete the project. Plaintiff Timothy Voss ("Voss"), MED's principal, signed DA-1 on behalf of MED.

Things did not go as planned. From the City's vantage point, it became apparent that MED's quality of work was not up to snuff. So, when MED asked the City to invest additional resources, the City rejected the proposal in light of MED's failure "to provide a professional and workmanlike product in many areas of the construction." The City also noted that "[i]f it is your desire that we take the project over along with the mortgage, as outlined in our agreement, you can so notify [us] at your discretion." On this point, the City's Manager, Thomas Steidel,

testified that "upon completion it was obvious that [the units] were not saleable" due to their lackluster quality. Steidel also testified that, in his view, MED had relinquished its rights in the Walnut Street project by invoking section 2.01(b), the "buyout clause," in which the City could take back the project. Subsequently, the City took over the project and completed the units, spending $1,996,860.17.

As a result of the dysfunction surrounding the Walnut Street project, Plaintiffs filed a complaint alleging an array of claims. In response, the City seeks to recover the costs it incurred finishing the 13 units, along with attorney's fees.

**B. The High Street Project**

In March 2009, the City and Middle Earth High Street LLC ("MEHS"), also owned by Voss, entered into a second Development Agreement ("DA-2"), this one involving the "High Street" project. Under DA-2, MEHS agreed to purchase properties from the City for $92,500.00 to build commercial space and residential apartments. As part of this agreement, MEHS was required to: (1) secure financing from the City through a $4,295,000.00 loan to be used exclusively for the construction of the project; (2) execute a related mortgage to the City on the properties; (3) sign personal guarantees; and (4) provide an "all hazards" insurance policy. Specifically, MEHS was able to "draw funds from the $4,295,000 construction loan for *hard costs* related to the development." The City agreed to meet with MEHS monthly in order to monitor the progress of the project. Finally, under DA-2, construction was required to begin on or before May 1, 2009, and conclude on or before July 1, 2010.

According to the City, soon after entering DA-2, MEHS began submitting questionable billing documentation. Apparently, the first "questionable" instance came on April 13, 2009, when MEHS submitted a "Sworn Owner's Statement" requesting a draw of $200,700.00. By

3

August 13, 2009, the City had paid MEHS a total of $451,950.00 in draws. On September 28, 2009, in a letter written by Voss, MEHS claimed that abutting property owners' encroachments had caused significant delays to the start date of the project. Voss claimed additional charges caused by delays and expenses totaling $257,550.00 and Voss also broached the possibility that MEHS could sell the property back to the City at $900,000, and then the City could "clear up the encroachment issues as it sees fit." In October 2009, the City informed MEHS that it was in breach of DA-2 because, in Defendants' words, "MEHS never constructed anything." Plaintiffs ultimately responded by filing a complaint, to which Defendants filed a counterclaim.

C. **Procedural Posture**

Defendants' summary judgment motion arrives before the Court in a somewhat odd procedural posture. A brief review of the case history is instructive. On March 29, 2010, Plaintiffs filed their initial complaint in Dearborn County Superior Court, alleging both federal and state law claims. On April 29, 2010, Defendants filed a notice of removal based on Plaintiffs' federal claims. *See* 28 U.S.C. § 1441(b) and (c). On August 2, 2011, Defendants filed the present Motion for Summary Judgment [Dkt. 69]. On October 3, 2011, the parties stipulated to the dismissal of all of Plaintiffs' federal claims [Dkt. 89], and, on October 7, 2011, the Court approved the stipulation [Dkt. 94].

With the federal claims dismissed from this case, normally the Court would weigh whether it should decline jurisdiction and remand the remaining pendent state law claims to state court. *See* 28 U.S.C. § 1367(c)(3) ("the district courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction"). Indeed, "the general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state law claims rather

4

than resolving them on the merits." *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1252 (7th Cir. 1994); *see also Leister v. Dovetail, Inc.*, 546 F.3d. 875, 882 (7th Cir. 2008) ("When the federal claim in a case drops out before trial, the presumption is that the district judge will relinquish jurisdiction over any supplemental claim to the state courts."); *Martin v. Indiana State Police*, 537 F. Supp. 2d 974, 989 (S.D. Ind. 2008) (unless remaining state claims are "no brainers," the "court's duty of comity toward Indiana courts in developing Indiana law directs the court to remand all state law claims to the state courts."). Given this presumption of relinquishment and the fairly modest number of disputes to date, the Court would be inclined to remand this case to the state court where it originated.

That being said, Plaintiffs have, at the eleventh hour, informed the Court that it may have subject matter jurisdiction over this case based on diversity of citizenship. *See* 28 U.S.C. § 1332. Specifically, in their amended summary judgment response brief, Plaintiffs state as follows:

> All plaintiff entities are organized or incorporated, and therefore domiciled, in the State of Ohio. Additionally, all members and/or shareholders of the plaintiff entities are domiciled in Ohio with the exception of Glenn Kukla, who is domiciled in Kentucky. … All Defendants are domiciled in Indiana. The amount in controversy is in the millions of dollars. Thus, diversity also supports jurisdiction in this case, regardless of the status of the 'federal claims.'

Dkt. 95 at 13-14.

However, this statement, without more, is inadequate to support diversity jurisdiction. First, Plaintiffs did not provide the *citizenship* of each individual plaintiff and defendant; nor have they provided the *citizenship* of each member of MEHS, which is required for limited liability companies. *See Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007) (for purposes of diversity jurisdiction, the citizenship of a limited liability company is the citizenship of each of its members). Second, Plaintiffs did not explicitly provide the principal place of

5

business of MED, which is required for corporations. *See* 28 U.S.C. § 1331(c)(1). Finally, although Plaintiffs clearly imply it, they need to explicitly provide the state of incorporation of MED. Based on these issues, Plaintiffs are **ORDERED** to furnish the missing information by Tuesday, December 20, 2011. If this information is provided in a satisfactory fashion, the Court will consider the merits of Defendants' motion for summary judgment. If Plaintiffs fail to provide this information, however, the Court will interpret their silence as an admission that the Court does not have original jurisdiction over this dispute, and consequently, will remand this matter back to Dearborn County Superior Court.

SO ORDERED.

Date: 12/13/2011

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Kevin M. Boyle
CARSON BOXBERGER LLP
boyle@carsonboxberger.com

Jeremy Michael Dilts
CARSON BOXBERGER
dilts@carsonboxberger.com

Edward J. Liptak
CARSON BOXBERGER
liptak@carsonboxberger.com

Mark Alan McCann
Nice & McCann
mmccann@nicelawfirm.com

Scott T. McClelland
MCCANN Legal
smcclelland@mccann-legal.com

Joshua Paul McMahan
Nice & McCann
jmcmahan@nicelawfirm.com

Robert Joseph Nice
NICE & MCCANN
rjnice@nice-law.com

Joseph Wilber Votaw , III
VOTAW & KISOR
josephvotaw@earthlink.net